UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

**BRADLEY EDWARD KIHN**,
          Plaintiff

v.                                                                          Case No. 1:19-CV-

                                        Hon. Robert J. Jonker

**BRENT DENNY**                                    **COMPLAINT AND**
**PHILLIP HESCHE**                                **JURY DEMAND**
**SONYA KIHN**
**LINDA KIMMEL**
**STAR THOMAS**
**SUSAN WARD,**
                    Defendants.

_____

Patrick William O'Keefe (P59324)
Attorney for Plaintiff
O'Keefe Law, PLLC
3893 Okemos Rd. Ste B1
Okemos, MI 48864
(517) 253-0114
patrick@okeefelaw.net

---

**COMPLAINT AND JURY DEMAND**

Plaintiff, for his complaint, states:

1. This is a civil action seeking money damages and equitable relief for violations of the United States Constitution and federal statutes under 42 U.S.C. §1985 (Conspiracy to Violate U.S. Constitution).

2. The Defendants conspired in an effort to wrongfully convict the Plaintiff of heinous sex crimes allegedly involving his minor children, HK and RK.

3. After Plaintiff was acquitted of all criminal charges, the Defendants further conspired to

terminate Plaintiff's parental rights.

4.  The Defendants eventually succeeded in terminating Plaintiff's constitutional right to parent his minor children, HK and RK.

5.  As a result of the Defendants' actions, Plaintiff can no longer be a father to his children.

6.  At all times relevant to this matter, Defendants Denny, Hesche, and Thomas were acting under color of law.

7.  This Court has jurisdiction pursuant to 28 USC §§1331 and 1343(a)(1-4) for the federal claims.

**GENERAL ALLEGATIONS**

8.  Paragraphs 1 - 7 are herein incorporated by reference.

9.  Plaintiff, Bradley Edward Kihn is, and at all relevant times was, a competent adult and a resident of Ingham County in the Western District of Michigan.

10. Defendant Brent Denny was a detective with the Ionia County Sheriff's Office at times relevant to the complaint; is now acting district court administrator in Ionia County; his county of residence is unknown, and he conducts his business in Ionia County in the State of Michigan, in the Western District of Michigan.

11. Defendant Phillip Hesche is a sergeant with the Ionia County Sheriff's Office; his county of residence is unknown; he conducts his business in Ionia County in the State of Michigan, in the Western District of Michigan.

12. Defendant Sonya Kihn is a competent adult; her residence is unknown; but is believed to be a resident of the Western District of Michigan.

13. Defendant Linda Kimmel is a competent adult; her residence is unknown; and during

times relevant to the complaint, was conducting business in the Western District of Michigan.

14. Defendant Star Thomas is a police officer for the City of Portland, Michigan, her county of residence is unknown, and she conducted her duties relevant to this complaint in Ionia County in the Western District of Michigan.

15. Defendant Susan Ward is a competent adult; her residence is unknown; and during times relevant to the complaint, was conducting business in the Western District of Michigan.

16. This cause of action arose in Ionia County in the Western District of Michigan.

17. At all times relevant to this matter, Defendants Thomas, Denny, and Hesche were acting under color of law.

### COUNT I - CONSPIRACY TO DENY DUE PROCESS AND/OR EQUAL PROTECTION (42 U.S.C. §1985 – FOURTEENTH AMENDMENT) AS TO ALL DEFENDANTS—CRIMINAL CASE

18. Paragraphs 1-17 are incorporated herein by reference.

19. Defendants conspired to deny Plaintiff's constitutional rights.

20. Plaintiff grew up in Portland, MI.

21. Defendant Kihn grew up in Ionia, MI (Lyons Township).

22. In December 2005, Plaintiff married Defendant Sonya (Pinnow) Kihn of Ionia, MI.

23. For a period of approximately 10 years, Plaintiff and Defendant Kihn were married.

24. During the course of their marriage, they had two minor children together, herein referred to as HK and RK.

25. The children are now believed to be about 13 and 11 years old.

26. Between 2015 and May 2018, the Defendants did conspire together and with other

unnamed persons to wrongly convict Plaintiff of crimes he did not commit; sever the bond

between him and his children; and terminate his parental rights.

27. A purpose of the conspiracy was to impede, hinder, obstruct and defeat the due course

of justice on behalf of Plaintiff in Ionia County, State of Michigan, unlawfully and in

violation of 42 U.S.C. § 1985(2).

28. Another purpose of the conspiracy was to deprive Plaintiff of the equal protection of the

laws or the equal privileges and immunities of the laws of the United States unlawfully

and in violation of 42 U.S.C. § 1985(3).

29. In April of 2016, Defendant Kihn allegedly was at home looking for a movie to watch with

her minor child, HK.

30. At that time, Defendant Kihn and HK allegedly discovered pornographic movies together

on the Dish Network DVR "Hopper".

31. For a period of at least one year, Defendant Kihn retained those movies on the Hopper in

plain view for all residents to see, including HK.

32. It is believed that while in his mother's custody and care, HK watched one or more of

those movies without his mother's permission.

33. Defendant Kihn knew or should have known these movies were at risk of being watched

by HK, RK, or the teenage boys also living in their house.

34. Defendant Kihn used this "porn movie night" story as a way to further derail Plaintiff's

efforts to regain his parenting time.

35. Under the pressure of his mother's inquest, HK claimed that his father made him watch

those movies.

36. In May of 2016, Child Protective Services (CPS) was notified of these allegations.

37. At this point, Plaintiff had not seen or spoken to his children for over 1 year because of a court-ordered "no contact" provision with his children.

38. HK and his younger sibling, RK, were interviewed separately at their school by a CPS worker regarding the anonymous complaint of abuse.

39. HK would have been approximately 8 years old when this allegedly occurred.

40. HK reported Plaintiff forced him and RK to watch pornographic movies with him.

41. HK did not report any sexual touching by Plaintiff.

42. RK would have been approximately 6 years old when this allegedly occurred.

43. RK did not report any sexual touching by Plaintiff.

44. RK did not report anything about being forced to watch pornographic movies with Plaintiff.

45. Defendant Kihn reported to CPS that she had no concerns about any type of physical or sexual abuse by Plaintiff.

46. Plaintiff has never physically or sexually harmed the children in his life.

47. After this alleged "discovery" by HK and his mother, she nonetheless retained these pornographic movies on the family "Hopper" for more than 180 days, without any parental controls to ensure the children could not view these movies.

48. Defendant Kihn maintained possession of the Hopper from May 2015 – November 2016.

49. For a period of approximately 18 months, the pornographic movies remained easily accessible to HK, RK, and other minor children who lived with Defendant Kihn.

50. On the Hopper, the porn movie icons appeared adjacent to recorded children's shows

(e.g., *Tom and Jerry* cartoon) and sports programs (e.g., *Michigan State University* basketball game).

51. After interviewing the children, CPS contacted the Ionia County Friend Of Court (FOC) investigator, Kevin Venton.

52. Venton was assigned as a conciliator/mediator/investigator in the custody case.[1]

53. CPS notified Venton of the allegations made by HK.

54. Defendant Kihn's retention of the porn videos without parental controls created a high degree of risk that HK and RK would see these movies.

55. This created a high degree of risk that HK would need to blame someone for "making" him watch these movies and prematurely learn about sexual acts.

56. Defendant Kihn also created high degree of risk that HK would need to blame someone to get out of trouble.

57. Defendant Kihn had discussed the porn movie night with Defendant Ward

58. Defendant Kihn had also discussed the porn movie night with Defendant Kimmel.

59. Through their respective relationships with Defendant Kihn and the children, Defendants Kimmel and Ward had discussed the porn movie night as professionals at *Journeys Counseling Center* in Ionia.

60. Defendant Ward had extensively discussed this matter with HK in therapy, thereby reinforcing the false belief that Plaintiff was an abusive parent.

61. Their concert of action brainwashed the boy and cultivated an attitude of contempt toward Plaintiff by making him the fall-guy.

---

[1] Plaintiff and Defendant Kihn were in the middle of a custody dispute over HK and RK.

62. Defendants Kihn, Ward, and Kimmel further used the May 2016 CPS report to further delay Plaintiff's custody reinstatement efforts.

63. Defendants Kihn, Ward, and Kimmel repeatedly discussed the allegation made by HK amongst themselves and the children.

64. Plaintiff's strident efforts to reinstate his parenting time was communicated amongst Defendants Kimmel, Ward and Kihn.

**BACKGROUND OF DEFENDANT WARD**

65. During times relevant to the complaint, Defendant Ward was a licensed master social worker (LMSW), acting as a therapist to HK, RK, Defendant Kihn.

66. For approximately 17 years, Defendant Ward had been licensed as a LMSW in the State of Michigan.

67. Defendant Ward was formerly employed as a CPS worker for the State of Michigan.

68. Defendant Ward was a child welfare trainer and supervisor for the Child Welfare Training Institute.

69. In her capacity as a CPS worker, Defendant Ward was trained to administer Michigan's Forensic Interview Protocol.[2]

70. In 2000, Defendant Ward began working part time in private practice as a therapist.

71. At all times relevant to this complaint, Defendant Ward possessed adequate training and knowledge of the forensic interviewing protocol.

72. Defendant Ward knew that the role of the therapist in disclosures of abuse is to provide support to the patient, but remain free of any forensic interviewing role to avoid

---

[2] https://www.michigan.gov/documents/dhs/DHS-PUB-0779_211637_7.pdf

tainting the child's memory.

## BACKGROUND OF DEFENDANT KIMMEL

73. Defendant Kimmel was a licensed professional counselor and the assigned "parenting time coordinator" for Plaintiff and Defendant Kihn.

74. Defendant Kimmel was assigned as parenting time coordinator by the FOC and/or the 8th Circuit Court.

75. Defendant Kimmel's primary function as parenting time coordinator for Plaintiff and Defendant Kihn was to teach them effective co-parenting strategies, during and after the divorce.

76. Defendant Kimmel also acted as a therapist to Defendant Kihn.

## INTERACTIONS BETWEEN DEFENDANTS KIHN, KIMMEL, AND WARD

77. Defendant Kihn and HK had previously discussed the alleged porn movie night incident

78. Defendant Kihn advised HK to discuss the matter with their therapist, Defendant Ward.

79. Defendant Ward had deliberately discussed the alleged porn movie night incident with HK during therapy sessions.

80. Defendant Kihn further instructed HK that his father was seeking reinstatement of his parenting time.

81. Defendant Kihn coached HK to report that his father had sexually abused he and RK back in early 2015 during the alleged porn movie night incident.

82. Defendant Ward eventually notified Defendant Denny of HK's disclosure of abuse.

83. Defendant Kihn eventually turned over the DVR Hopper to Defendant Denny, who retained the item as evidence.

84. Defendant Denny was the lead detective with the Ionia County Sheriff's Office.

85. Defendant Denny set up a forensic interview of the children with Defendant Thomas.

86. Defendant Thomas conducted a deeply flawed forensic interview of both children.

87. Defendant Ward notified Defendant Kihn of HK's alleged report of abuse.

88. Defendant Kihn notified Defendant Denny.

89. Defendant Denny requested the prosecutor to issue multiple counts of criminal sexual conduct against the Plaintiff.

90. On November 18, 2016, Plaintiff was charged by the Ionia County Prosecutor with 5 felony counts of criminal sexual conduct (CSC), in the first and second degree.[3]

91. Defendant Denny took the arrest warrant to the Circuit Court Judge, who authorized all 5 charges.

92. Plaintiff was working in Lansing when he was arrested by members of the Ionia County Sheriff's Office.

93. Plaintiff was held in the Ionia County Jail for 82 days without bail.

94. Plaintiff's minor children, HK and RK, were listed as the alleged victims in the 5-count felony complaint.

95. Defendant Hesche assisted Defendant Denny in conducting a flawed and incomplete investigation.

96. After a two-week jury trial, Plaintiff was acquitted of all criminal charges on January 25, 2018.

---

[3] If convicted of Count 1 (CSC 1ST Degree - Child Under 13), Plaintiff faced a mandatory minimum prison sentence of not less than 25 years.

97. Despite his acquittal on criminal charges, Plaintiff's parental rights were terminated on or about May 10, 2018.

98. Plaintiff was harmed by the conduct of Defendants in that he was forced to stand trial for crimes he did not commit.

99. Plaintiff was further harmed by the conduct of Defendants after his acquittal, when they continued to seek the termination of Plaintiff's parental rights.

100.     The harms in Paragraphs 98 and 99 above were a direct and proximate result of Defendants' conspiratorial efforts to deprive Plaintiff of his Fourteenth Amendment rights to due process and equal protection of the laws.

<u>**APPROXIMATE TIMELINE AND SPECIFIC ALLEGATIONS**</u>

<u>**2015**</u>

101.     Plaintiff and Defendant Kihn were going through a divorce in Ionia County.

102.     Defendant Kihn had moved out of the marital house around November 2014.

103.     **January – April 2015**, HK and RK stayed with Plaintiff-father every other weekend at the marital home located at 8152 Murphy Rd, Lyons, MI (Ionia County).

104.     Plaintiff was living there alone at that time.

105.     The sexual assault charges issued by the Ionia County Prosecutor indicate these alleged acts of sexual abuse occurred on a single night in early 2015, when the children were staying overnight with Plaintiff every other weekend.

106.    **April 26, 2015** - the last time Plaintiff exercised parenting time and spoke to HK and RK.[4]

107.    The children returned to their mother's care that day for her regularly scheduled parenting time.

108.    **April 28, 2015** - Defendant Kihn contacted the Michigan State Police to search the marital property located at 8152 Murphy Rd. on a report that methamphetamine was being kept there.

109.    After searching the property, officers found what appeared to be methamphetamine components and less than 0.01 gram of methamphetamine residue.

110.    Plaintiff was arrested and eventually charged with Possession of Methamphetamine and Possession of Methamphetamine Laboratory Components, and misdemeanor reporting act violations.[5]

111.    The Court then entered a "no contact" order preventing Plaintiff from having contact with his minor children during the pendency of his criminal case.

112.    **May 2015** - Defendant Kihn repossessed the marital home at 8152 Murphy Rd after Plaintiff moved out.[6]

113.    Defendant Kihn then took possession of Dish Network DVR "Hopper" Receiver.

114.    Defendant Kihn eventually moved out of 8152 Murphy Rd and took the Hopper with her to her new home.

---

[4] This would have been a regularly-scheduled weekend with Plaintiff, and the last time he had parenting time with HK and RK.
[5] Plaintiff was found to be in possession of less than 1/100th of a gram of methamphetamine residue.
[6] Plaintiff moved out of 8152 Murphy and Defendant Kihn moved back in.

115.    **June 2015**, Defendant Kihn hooked up the Hopper at her new home and re-

activated the old Dish Network account.

116.    During the pendency of their divorce, FOC recommended that Plaintiff and

Defendant Kihn engage in co-parenting classes.

117.    Defendant Kimmel was appointed by the Court as a parenting

coordinator/counselor to assist Plaintiff and Defendant Kihn in co-parenting their

children.

118.    **June 24, 2015**, Defendant Kimmel emails FOC's Kevin Venton recommending

that co-parenting classes not occur between Plaintiff and Defendant Kihn until parenting

time resumed for Plaintiff.

119.    **July 2015**, Defendant Kihn begins taking HK and RK to Defendant Ward's

counseling office for bi-weekly therapy sessions.

120.    Defendants Kimmel and Ward would often collaborate and share information

regarding HK, RK, Plaintiff, and Defendant Kihn.

121.    **September 18, 2015** – Defendant Kimmel makes a written recommendation to

FOC to continue suspension of Plaintiff's parenting time.

122.    **October 14, 2015** - FOC recommends *both* parents submit to a psychological

evaluation.

123.    FOC further recommends that Kimmel shall recommend a psychologist to

perform evaluations of Plaintiff and Defendant Kihn.

124.    FOC further recommends both Plaintiff and Defendant Kihn participate in co-

parenting sessions to be conducted by Defendant Kimmel.

125.    **November 2015** – Plaintiff is formally charged with felony and misdemeanor controlled substance and reporting violations arising out of the incident in April of 2015.

126.    Plaintiff's parenting time remains suspended pending the outcome of the criminal drug case.

127.    FOC recommends that Plaintiff's parenting time remain suspended until his drug case is resolved.[7]

**2016**

128.    **March 11, 2016** – Plaintiff pleads no contest to one felony for maintaining an area which he had reason to know was used to manufacture methamphetamine; and two misdemeanors for violations of the methamphetamine reporting act.

129.    **April 27, 2016** - approximate date Defendant Kihn claims to have discovered pornographic videos with HK on the Dish Network Hopper.

130.    **May 4, 2016** - anonymous complaint is made to CPS alleging improper supervision of minor children by Plaintiff; Defendant Kihn reports that her son was forced to watch porn with Plaintiff.

131.    **May 5, 2016** - CPS worker Lindsey Leak makes an unannounced visit to HK and RK's school to conduct a forensic interview of the children.

132.    There is no disclosure of any physical or sexual abuse by either child.

133.    RK says Plaintiff never assaulted her or did anything inappropriate with her.

---

[7] FOC's stated reason was they did not want to reinstate parenting time between the children and Plaintiff if he were to be sentenced to jail.

134.      RK never even mentions being forced to watch pornographic movies with

Plaintiff.

135.      HK claims his father forced them to watch pornographic videos, by denies any

physical or sexual contact by Plaintiff.

136.      Defendant Kihn begins talking to HK about "porn."

137.      **May 26, 2016** – Defendant Kihn takes photos of the pornographic movie icons on

the television screen.

138.      **June 28, 2016** - Plaintiff is sentenced for the drug case; receives 1 day in jail with

credit for 1 day served and 36 months of probation.

139.      Defendant Kihn begins to establish her own therapist/patient relationship with

Defendant Ward.

140.      HK and RK continue to participate in bi-weekly therapy sessions with Defendant

Ward.

141.      HK talks to Defendant Ward about "porn."

142.      **August 5, 2016** – Plaintiff signs a Release of Information (ROI) to allow his

psychological evaluation to be shared with Defendant Kimmel.

143.      Plaintiff undergoes a full, psychological assessment by Dr. Sharon Hobbs, a

licensed psychologist located in the Lansing, MI area.

144.      **August 19, 2016** – Defendant Kimmel emails Plaintiff inquiring about the results

of the assessment.

145.      **August 20, 2016** - Plaintiff emails Kimmel back and reports the psychological

evaluation with Dr. Hobbs took place two weeks earlier.

146.    Plaintiff asks Kimmel to contact Dr. Hobbs directly for results.

147.    Defendant Kimmel asks Plaintiff if the report will be sent directly to her.

148.    Plaintiff replies that he is not sure.

149.    **August 22, 2016** – Defendant Kimmel thanks Plaintiff for the update.

150.    In response to the court's sentence, the Ionia County Friend of the Court (FOC)

places conditions precedent to Plaintiff having his parenting time reinstated.

151.    Those conditions were that he receive no jail time for his offense; submit clean

drug and alcohol screens; and undergo a psychological assessment.

152.    Plaintiff had submitted clean drug and alcohol samples each and every time he

was required to test.

153.    As stated earlier, he received no jail time for the drug case.

154.    **September 1, 2016** - Dr. Hobbs completes her written assessment report of

Plaintiff.

155.    Dr. Hobbs' report is faxed to Plaintiff's family law attorney.

156.    Dr. Hobbs opines there were "no issues of abuse as far as (she) could ascertain

from either the (Plaintiff's) interview or from the report of the (FOC) conciliator."[8]

157.    Dr. Hobbs recommends that Plaintiff's parenting time be reinstated

"immediately."[9]

158.    Dr. Hobbs further states that "[I]t is unclear why a criminal case which did not

suggest any assaultive behaviors towards his children, with a man who had major

---

[8] Psychological Assessment by Dr. Hobbs, p. 3 of 5, ¶1.
[9] Id. at p. 5 of 5, ¶1.

parenting responsibility, would mean a lapse of 15 months in contact time (with his children)."[10]

159.     Dr. Hobbs indicates that Plaintiff's indefinite suspension of parenting time during the period of separation and divorce "was very unfortunate for Mr. Kihn as well as for the children and probably did a lot more harm than was anticipated when the order was issues (sic)."[11]

160.     Dr. Hobbs recommends that the children should have three or four shorter parenting times with the father, supervised for a few hours, just to reintroduce Plaintiff to the children.[12]

161.     Dr. Hobbs also recommends that Plaintiff and Defendant Kihn "be ordered to take part in co-parenting sessions…to make sure that the children are not put in a position where their angry parents will sabotage their childhood."[13]

162.     Defendant Kihn never gets her own psychological evaluation.

163.     **September 22, 2016** - Plaintiff again inquires as to whether Defendant Kimmel had received the report from Dr. Hobbs.

164.     Plaintiff emails Defendant Kimmel to see if she received the report on September 21, via fax, from Dr. Hobbs.

165.     **September 26, 2016** – Defendant Kimmel tells Plaintiff she is on holiday until October 1, 2016.

---

[10] Id.
[11] Id.
[12] Id.
[13] Id. at ¶ 3.

**166.**    **October 2016** – Defendants Ward and Kimmel discuss Plaintiff's efforts to reinstate parenting time.

167.    **October 3, 2016** - Plaintiff emails Defendant Kimmel to find out whether she has received the report yet.

168.    4:32 p.m. - Dr. Hobbs emails her report to Defendant Kimmel.

169.    4:39 p.m. - Plaintiff emails Defendant Kimmel to see if she has received Dr. Hobbs' report yet.

170.    Defendant Kimmel sees the email from Plaintiff, which is sent just 7 minutes after Defendant Kimmel received the report from Dr. Hobbs.

171.    7:15 p.m. - Defendant Kimmel responds that she had *not* received the report yet.

172.    Defendant Kimmel deliberately delays the processing of Dr. Hobbs' report in order to defeat or delay Plaintiff's efforts to reunite with his children.

173.    Defendant Kimmel gives Plaintiff her fax number so he can fax Dr. Hobbs' report.

174.    Defendant Kimmel further indicates she contacted Dr. Hobbs again for her report.

175.    Defendant Kimmel invites Plaintiff to check with Dr. Hobbs directly, if he liked.

176.    Plaintiff thanks Kimmel for her reply.

177.    Plaintiff informs Defendant Kimmel that Dr. Hobbs had provided her report to Defendant Kimmel some time ago.

178.    **October 10, 2016** - Plaintiff reaches out via email to FOC coordinator Venton to determine whether he has received the psychological assessment from Defendant Kimmel.

179.	Plaintiff emails FOC and expresses frustration for the delays caused by

Defendant Kimmel.

180.	Venton indicates he will contact Defendant Kimmel to ask for a status update on

the assessment.

181.	**October 11, 2016** - Plaintiff emails Venton that Defendant Kimmel has had plenty

of time to obtain the assessment and forward her findings on to FOC.

182.	Venton forwards Plaintiff's email to Defendant Kimmel.

183.	Venton replies to Plaintiff that he will email Defendant Kimmel for a status

update.

184.	Venton gets no response from Defendant Kimmel.

185.	Plaintiff asks Venton to inform Defendant Kimmel that he expects to regain his

parenting time this week.

186.	**October 12, 2016** - Defendant Kimmel emails both Plaintiff and Venton and

states that she was finding less information in the Psychological Report from Dr. Hobbs

than she was used to seeing in such reports.

187.	Defendant Kimmel further asks Plaintiff, who has no more than a high school

diploma, if he would directly ask Dr. Hobbs to document Plaintiff's scores on her

psychological assessments and provide her rationale for selecting those particular tests.

188.	Plaintiff asked Defendant Kimmel if it would be too much to have Kimmel contact

Dr. Hobbs directly to get any further information Kimmel needs.

189.	Defendant Kimmel tells Plaintiff it is much easier and more ethical for Plaintiff to

get the data from Dr. Hobbs himself.

190.     It is believed that between the dates of October 3, 2016 and October 13, 2016, and possibly earlier, Defendants Kimmel, Kihn, and Ward communicated regarding the imminent restoration of Plaintiff's parenting time.

191.     Defendants Ward and Kimmel kept Defendant Kihn apprised on Plaintiff's attempts to restore his parenting time.

192.     Plaintiff never signs a release of information (ROI) for Defendant Kimmel to discuss his psychological assessment with Defendants Ward, Kihn, or anyone other than FOC and Dr. Hobbs.

193.     Nonetheless, Defendants Ward and Kimmel violate Plaintiff's privacy by sharing his protected health related information.

194.     **October 13, 2016 – The Disclosure.** Defendant Kihn drops off HK to see Defendant Ward at Journeys Counseling Center in Ionia for a therapy session.

195.     HK allegedly discloses that his father sexually assaulted him and RK back in early 2015.

196.     Defendant Kihn returns to Journeys Counseling Center to pick up HK.

197.     Defendant Kihn takes HK to football practice.

198.     Defendant Ward sends a text message to defendant Kihn later that evening, stating HK "talked openly about the porn movie night experience."

199.     Defendant Ward knew that the act of text messaging a patient's parent was not HIPAA compliant.[14]

---

[14] Crim Tr Transcr 21: 12-13.

200.     Defendant Kihn's mother, Cheryl Pinnow, the Ionia County 64A District Court

Administrator, is sitting next to Defendant Kihn when she receives this text message

from Defendant Ward.

201.     **October 14, 2016** –**Police Report.** Defendant Kihn travels to Journeys Counseling

Center to meet with Defendant Ward regarding the allegation made by HK.

202.     Defendant Kihn then drives to a nearby restaurant to speak with her mother,

Cheryl Pinnow, and Ionia County Magistrate David Wirth regarding the allegation.[15]

203.     Wirth contacts Defendant Brent Denny of the Ionia County Sheriff's Office to

notify him that Defendant Kihn needed to make a report of sexual abuse involving her

child.

204.     Defendant Kihn and her mother, Cheryl Pinnow, arrive at ICSO a short time later.

205.     Defendant Kihn and her mother meet with Defendant Denny of the Ionia County

Sheriff's Office.

206.     Defendant Denny and Defendant Kihn's mother, Ms. Pinnow, have been friends

for approximately two decades, having worked together in Ionia County government.

207.     Defendants Denny and Kihn have been well-acquainted since at least 2006.

208.     Defendant Kihn forwards to Defendant Denny a copy of the text message she

allegedly received from Defendant Ward regarding HK's allegations of abuse.

209.     Defendant Denny schedules a forensic interview of the children to take place the

following week with Defendant Thomas.

---

[15] At the time, Cheryl Pinnow was the acting district court administrator in the 64-A District Court, which is where this case was originally prosecuted. The Honorable Raymond Voet recused himself from the criminal case. David Wirth was the acting magistrate in the 64-A District Court, but he was not involved in the case.

210.     Defendant Denny hand-picks Defendant Star Thomas to conduct the forensic interview of both children because of her friendly relationship with Defendant Kihn's mother and family.

211.     Defendant Denny discusses his selection with Defendant Kihn, who assents to her selection as forensic interviewer.

212.     Defendant Denny pulls some strings to get the interview specially scheduled at the Ionia-Montcalm Children's Assessment Center (hereinafter, the Center).

213.     Defendant Thomas accepts the assignment, knowing she has a conflict of interest.[16]

214.     **October 15, 2016 – CPS Report**. On-call CPS worker Megan Krause is contacted.

215.     **October 19, 2016** - Plaintiff emails his family law attorney asking if they have heard from Dr. Hobbs on providing Defendant Kimmel with the psychological report.

216.     **October 20, 2016 – RK's Therapy Session.** Defendant Kihn transports RK to meet with Defendant Ward for her therapy session, just one day before the children are scheduled to be forensically interviewed at the Center by Defendant Thomas.

217.     Defendant Ward deliberately brings up the subject of sexual abuse with RK.

218.     Defendant Ward shows RK books along with pictures of "good touch, bad touch."

219.     Defendant Kihn coaches RK to falsely report to Defendant Ward that Plaintiff touched her with his penis.

---

[16] Defendant Thomas's family and Defendant Kihn's family were well acquainted. Both had strong ties to local law enforcement. Thomas's and Kihn's children used to attend the same daycare.

220.     **October 21, 2016 – The Forensic Interviews of HK and RK.**

221.     Defendant Kihn keeps HK and RK out of school, despite their interviews not being scheduled until after 2 p.m.

222.     Defendant Kihn takes HK and RK to a special breakfast at Big Boy with their grandparents, David and Cheryl Pinnow.

223.     Defendant Kihn purchases them milkshakes.

224.     Defendant Kihn drives HK and RK to the Center for their interviews.

225.     Defendant Kihn discusses the upcoming interviews with both children.

226.     Prior to the interviews, Defendant Thomas fails to develop viable, alternative hypotheses (e.g., coaching, custody battle, accidental touching, routine caregiving, etc.) to help test whether the children are telling the truth or whether they may have been influenced by other factors.

227.     During her interview, RK tells Defendant Thomas that her mother, Defendant Kihn, told her to she was coming to the Center to talk about Plaintiff touching her "pee-bug."[17]

228.     Defendant Thomas fails to ask follow-up questions to this response to determine whether RK may have been coached.

229.     Instead, Defendant Thomas assures RK that she is not in trouble.

230.     Defendant Thomas conducts a flawed forensic interview of both children, rife with violations of *Michigan's Forensic Interview Protocol*.

---

[17] "Pee-bug" was RK's word for both the male and female genitalia.

231.     During HK's interview, he alleges that Plaintiff forced HK and RK to watch porn as he sexually assaulted them.

232.     HK proceeds to tell a bizarre story about things he allegedly saw on the porn movies.

233.     According to Forensic Interview Protocol, police officers who perform forensic interviews of minor children are discouraged from wearing uniforms, badges, and guns into the interview room.

234.     The purpose of this provision is to ensure that the child is being interviewed in a child-centered environment, free from distractions, and does not feel pressure to please the police officer as an authority figure by giving her the answer she is looking for.

235.     Forensic Interview Protocol indicates some children may be more likely to agree with the interviewer because she is a police officer, even if the child knows the story to be false.[18]

236.     Prior to the interview, HK already knew that Defendant Thomas was a police officer.

237.     HK and RK have been taught to respect members of law enforcement—his grandmother, Cheryl Pinnow, worked in the prosecutor's office and courts for decades; their family is very pro-law enforcement; and Plaintiff has taught HK and RK not to talk back to authority figures or disagree with them.

---

[18] Research shows that certain children—especially those who are taught to look up to and respect police officers—may be more likely to agree with the police-interviewer in order to show respect for an authority figure. If the police-interviewer implies or suggests a particular answer to the child in a closed-question (or leading question), the child is more likely to give the police-interviewer the answer they are looking for.

238.    At the criminal trial, HK and RK were accompanied by a police officer in the waiting room outside the courtroom.

239.    The police officer had no affiliation with the case, but was likely included to give the children the impression they were not safe in the courthouse because of Plaintiff's presence.

240.    Therefore, HK and RK may be more likely to agree with Defendant Thomas because she is a police officer.

241.    Prior to the actual interview, Defendant Thomas fails to conduct a thorough, collaborative background investigation in order to develop viable alternative hypotheses that may provide another reason for the disclosure.[19]

242.    Defendant Thomas, based on her training and experience, knew or had reason to know that the forensic interview is a "hypothesis testing" rather than "hypothesis confirming" process.

---

[19] According to Michigan's Forensic Interview Protocol, https://www.michigan.gov/documents/dhs/DHS-PUB-0779_211637_7.pdf there are numerous alternative hypotheses to allegations of abuse and neglect. These include honest mistakes and misunderstandings, unintentional influence of the child, intentional influence of the child, and a child's decision to lie for attention or to achieve another goal. The following are some examples:

- Touching occurred during routine caregiving.
- **Repeated questioning made the child believe abuse occurred.**
- **Someone coached the child to report abuse.**
- The child wanted to retaliate against the accused.
- **The child made up a story to get out of trouble.**
- The child reported sexual abuse to cover for evidence of sexual activity.
- The child lied about abuse or neglect to attempt to change a living or visitation arrangement.
- The child lied about who the perpetrator was to protect the actual perpetrator.

243.    Defendant Thomas knew—or should have known through discussions with investigators—that Plaintiff and Defendant Kihn had gone through a bitterly contentious divorce and custody battle.

244.    Defendant Thomas knew or should have known that Plaintiff was fighting to get his parenting time reinstated.

245.    Defendant Thomas knew or should have known that Plaintiff was on the verge of having his parenting time reinstated.

246.    Defendant Thomas knew or should have known that in May of 2016, just 5 months earlier, both HK and RK failed to disclose anything involving sexual touching.

247.    Defendant Thomas knew or should have known that parental coaching was a viable alternative to abuse, especially in this situation.

248.    Defendant Thomas knew or should have known that Defendant Kihn had exclusive parenting time for approximately 18 months, and Plaintiff had no time with them for that same period.

249.    Despite this rather obvious alternative hypothesis, Defendant Thomas failed to test this viable, alternative hypothesis.

250.    Defendant Thomas failed to interview the children's mother, Defendant Kihn, prior to conducting the forensic interview, in order to learn more about the nature and circumstances of the disclosure, as well as the family dynamics.

251.    Defendant Thomas began the interviews by introducing herself by her middle name (Lynn), which caused confusion with HK.

252.     At the criminal trial, HK testified that he found it odd that she introduced herself as "Lynn", when he knew her real name was Star.

253.     Defendant Thomas likely attempted to disguise herself from HK and RK so they would not recognize her as a police officer or a mother from their old daycare.

254.     HK also testified that his mother, Defendant Kihn, told him he was going to speak to a woman named "Star" in advance of the forensic interview.[20]

255.     Defendant Thomas advanced the goals of the conspiracy by reinforcing false beliefs that were planted in the children's heads by Defendant Kihn.

256.     Defendant Thomas failed to recuse herself to avoid even the appearance of impropriety.

257.     Defendant Thomas used her own confirmation bias against the Plaintiff in an effort to "pin it" on him, as opposed to ruling out alternative hypotheses that could have exonerated Plaintiff.

258.     Defendant Thomas further reinforced the children's false beliefs and/or false memories that they were victims of Plaintiff's abuse.

259.     Defendant Thomas failed to explore the possibility that HK watched the porn movies, and simply inserted Plaintiff as one of the actors.

260.     Defendant Thomas's repeated violations of forensic interview protocol caused Plaintiff's minor children to develop false memories or beliefs planted and cultivated by Defendants Kihn, Ward, and Kimmel.

---

[20] Crim Tr Trancr 52: 8-13

261.    **October 27, 2016** - Ward meets with HK and RK in her office to continue their

therapy sessions; continues to question HK and RK about alleged disclosures.

262.    Defendant Ward asks if RK remembers what they talked about when they met

last time.

263.    RK says, "yes, pee-bugs,[21] I don't want to talk about it."

264.    Defendant Ward continues to nurture the seeds of these false accusations by

continually speaking to the children about them.

265.    Defendant Ward's actions of repeatedly questioning the children are a direct

violation of the forensic interview protocol and served to advance the purposes of the

conspiracy by reinforcing the false beliefs instilled by Defendants Kihn and Thomas.

266.    **October 28, 2016** – Defendant Kimmel emails FOC's Kevin Venton, saying "I'm

assuming you're in the loop" regarding the allegations.

267.    Venton responds that he is not in the loop.

268.    **October 31, 2016** – Defendant Kimmel emails FOC's Kevin Venton saying the

"Kids have disclosed enough to get (Plaintiff) charged with CSC 1 or 2," three whole

weeks ***before*** criminal charges are authorized by the prosecuting attorney.

269.    In order for Defendant Kimmel to know the exact degree of CSC that Plaintiff

could be charged with—three whole weeks before charges were authorized by the

prosecuting attorney—she must have spoken to one or more of her Defendants or

conspirators.

---

[21] At the time of the interviews, "pee bug" was the children's term for both male and female genitals.

270.      Defendant Kimmel acted in furtherance of the conspiracy by colluding with

Defendants Kihn and Ward to get the Plaintiff charged with sex crimes.

271.      Having met with Defendant Kihn at least a 13 times over the course of the

previous year, Defendant Kimmel formed a friendship with Defendant Kihn, and became

her advocate.

272.      Having met with Plaintiff just once over the course of the previous year,

Defendant Kimmel showed she had no interest in promoting equal rights and

opportunities between Plaintiff and Defendant Kihn as parents.

273.      Despite her role as parenting time coordinator, Defendant Kimmel had no

interest in fostering a renewed relationship between Plaintiff and his children.

274.      Defendant Kimmel sought to assist Defendant Kihn in severing the bond

between Plaintiff and his children.

275.      Defendant Kimmel stepped out of her role as court-appointed parenting time

coordinator and into the role of ***advocate*** for Defendant Kihn.

276.      Defendant Kimmel deliberately ignored the red flags in this case.

277.      Defendant Kimmel had a duty to act as parenting coordinator for both parents.

278.      Had Defendant Kihn done her job, she would have met with Plaintiff more than

once.

279.      Had Defendant Kihn met with Plaintiff more than once, she would have

understood that Plaintiff was a good parent to his children.

280.      **November 1, 2016** - Venton emails CPS worker Brittany Ramsey for an update.

281.     Venton indicates that Defendant Kimmel informed him Plaintiff could be facing

charges of CSC 1st or CSC 2nd involving one of the children.

282.     Defendant Ward writes a letter to Defendant Denny, stating both children

disclosed being sexually assaulted by Plaintiff.

283.     Defendant Ward further states that she believes both children are suffering from

Post-Traumatic Stress Disorder (PTSD) as a result of the alleged incident.

284.     **November 3, 2016 – Defendant Ward meets with HK**, and continues to question

him about his disclosures.

285.     Defendant Ward continues to cultivate the false accusations and/or beliefs

planted in the children's heads in order to help Defendant Kihn remove Plaintiff from

the picture.

286.     As a former CPS worker who was familiar with forensic interview protocol,

Defendant Ward knew or should have known that repeated questioning would serve to

taint the minds of the children.

287.     **November 4, 2016 – Physical Examination of Children**. Physician at DeVos

Children's Hospital's Center for Child Protection conducts a forensic sexual assault

examination of the minor children.

288.     Medical staff continue to question the children and Defendant Kihn about what

happened.

289.     The examining physician finds no physical evidence of sexual or physical abuse in

either child or any evidence of sexually transmitted infections.

290.     **November 10, 2016 – RK meets with Defendant Ward for a therapy session**.

291.    Defendant Ward continues to repeatedly question RK about her about her

earlier disclosures.

292.    RK allegedly says "this is where my Papa hurt me, pointing to her vagina."

293.    RK allegedly provides no further details or free narrative of this alleged incident.

294.    **November 14, 2016 – Prosecutor's Office Gets Involved.** Jennifer Yuhas, senior

legal secretary at the Ionia County Prosecutor's Office and close friend of Defendant

Kihn, accesses the records management system of the Ionia County Sheriff's Office and

extracts all police reports related to the investigation of Plaintiff.

295.    **November 18, 2016 – Plaintiff Formally Charged.** Ionia County Prosecutor's

Office issues a five-count felony complaint against Plaintiff for CSC 1st degree

(penetration involving a child under 13 years of age); and four counts of CSC 2nd (non-

penetrative sexual touching involving child under 13 years of age).

296.    The 64A (Ionia) District Court Judge, Honorable Raymond Voet, is the only public

official to recuse himself from handling the case.

297.    HK's and RK's grandmother, Cheryl Pinnow, was Judge Voet's district court

administrator.

298.    Ms. Pinnow is very high up in Ionia County government, having worked there for

approximately 3 decades.

299.    Ms. Pinnow had worked for the Ionia County Prosecutor's office for several

years.

300.    Because of Ms. Pinnow's connections and relation to Defendant Kihn,

Defendants Denny, Hesche, and Thomas wanted to please Ms. Pinnow and her family.

301.    **November 18, 2016 – Felony Complaint Authorized.** Defendant Denny takes the felony complaint from the prosecutor's office to the Honorable Suzanne Hoseth Kreeger, who then authorizes the complaint and arrest warrant against Plaintiff.

302.    Ionia County Sheriff's Deputies arrest Plaintiff at work.

303.    Plaintiff is lodged at the Ionia County Jail to await arraignment on the 5 counts of criminal sexual conduct.

304.    The minimum sentence for a person convicted of count 1, CSC 1st—with a child under 13 years old—is not less than 25 years in prison.[22]

305.    The maximum sentence for CSC 1st is up to life in prison.

306.    The maximum sentence for a person convicted of CSC 2nd with a child under 13 is up to 15 years in prison.

307.    Defendants not only conspired to frame Plaintiff; they conspired to frame him of the most heinous crimes imaginable.

308.    **November 21, 2016 – Plaintiff is arraigned** by visiting Judge Michael Clarizio of the 65-A District Court.

309.    Plaintiff pleads not guilty to all charges.

310.    Bail is denied.

**311.**    **December 9, 2016 – Plaintiff's preliminary hearing commences.**

312.    Assistant Prosecutor Lori Kirkoff makes a plea offer of one count of CSC 1st with a mandatory minimum of at least 25 years in prison.

---

[22] MCL 750.520b(2)(b).

313.     Kirkoff threatens Plaintiff that if he rejects the plea offer and exercises his statutory right to a preliminary examination, they will not make any more plea offers.

314.     Plaintiff rejects the plea offer and exercises his right to a preliminary examination.

315.     Kirkoff then refuses to call HK or RK to the stand, arguing that the 6th Amendment right to confront witnesses does not apply at a preliminary hearing.

316.     In order to please the Pinnow family and Defendant Kihn, Kirkoff deprived Plaintiff of his only pre-trial opportunity to confront his accusers and potentially get the charges dismissed.

317.     Rather than call the children to the stand, Kirkoff relied on hearsay taken from medical records to establish probable cause.[23]

318.     Preliminary examination is continued to January 25, 2017.

## 2017

319.     **January 25, 2017** – Preliminary examination continues.

320.     Plaintiff is bound over to circuit court as charged on all counts.

321.     **February 7, 2017** - Bail is granted in the amount of $250,000 cash or surety.

322.     Plaintiff is released from Ionia County Jail after serving 82 days.

323.     **February 23, 2017** - HK meets with Defendant Ward.

324.     **March 8, 2017** - RK meets with Defendant Ward for the last time.

325.     **March 15, 2017** - HK meets with Defendant Ward for the last time.

---

[23] Kirkoff insisted that the testimony of the accusers was not necessary because MCL 766.11B was applicable. MCL 766.11B allows business records to be admitted as opposed to live testimony of the victims here. Plaintiff's attorneys objected; however, the court admitted the medical records over that objection.

326.     Defendant Ward continues to have discussions with HK and RK about the family before divorce, focusing on Plaintiff.

327.     **March 30, 2017** – Defendant Denny delivers the DVR Hopper to Michigan State Police forensic video analyst for examination; this fact is not communicated to Plaintiff until *after* he hires his own expert for forensic video analysis.

328.     **March 31, 2017** – Michigan State Police examines the Hopper; determines the dates and times cannot be ascertained due to proprietary protections installed on the device.

329.     **April 27, 2017** – Defendant Hesche emails Defendant Denny saying the Plaintiff's criminal lawyers were a "bunch of stupid fuckin assclowns who should be hanged for stealing my air."

330.     Defendant Hesche hoped it would cost Plaintiff additional money to have evidence tested by a defense expert.

331.     Defendant Hesche wanted Plaintiff to be forced to expend substantial sums of money to hire attorneys and experts to defend him.

332.     Defendants Hesche and Denny knew they could get the data from the Hopper if they went directly with Dish Network.

333.     Defendant Hesche possessed all the necessary contact information to get more specific data from the Hopper directly from Dish Network.

334.     Yet Defendants Hesche and Denny did not even try to get the Hopper analyzed by Dish Network.

335.      **May 3, 2017** – over the prosecutor's objection, Plaintiff receives a court order for

his forensic video expert to examine the Hopper.

336.      **May 25, 2017** – Plaintiff's video expert determines he cannot ascertain the dates

or times when the videos were watched.

337.      **May 30, 2017** – Prosecutor's motion for special accommodations is adjourned;

prosecutor notifies Plaintiff of the Hopper examination conducted by Michigan State

Police back on March 31, 2017.

338.      **June 5, 2017** – Defendant Hesche emails Defendant Denny, saying "I hope that it

cost Kihn another 3 grand of his moms money" to hire his own forensic video analyst.

339.      **June 13, 2017** – Court orders Defendant Ward to produce her records of therapy

sessions with HK and RK.

340.      **June 28, 2017** – Court signs a *Stanaway*[24] order compelling Defendant Ward to

produce her notes and records pertaining to HK's and RK's therapy sessions that

occurred on or after October 13, 2016.

341.      **July 5, 2017** – Court's deadline for Defendant Ward to turn over her notes

pursuant to the *Stanaway* order.

342.      **July 12, 2017** – Defendant Ward forges her doctor's signature in an attempt to

be excused from her subpoena to appear in court.

---

[24] *People v Stanaway*, 446 Mich 643, 664; 521 NW2d 557 (1994).

343.    **July 13, 2017** – Defendant Ward fails to appear in court under prosecutor's

subpoena to testify in support of a motion for special accommodations.[25]

344.    **August 11, 2017** – Defendant Ward again fails to appear in court to answer for

her subpoena for her handwritten notes of sessions with HK and RK.

345.    **August 23, 2017** – Defendant Ward is arraigned on contempt of court charge.

346.    **August 24, 2017** – Defendant Ward is held in contempt of court for failing to

appear, forging her doctor's signature, and failing to timely produce *Stanaway* records.

347.    **October 3, 2017** – Plaintiff's motion to compel production of Defendant Ward's

cell phone records and contents is denied.

348.    **October 17, 2017 –** Over the prosecutor's objection, Plaintiff's motion to allow a

forensic handwriting expert to analyze Defendant Ward's notes is granted.

349.    **October 30, 2017 –** Plaintiff's trial is adjourned.

350.    **December 12, 2017 –** a representative from Speckin Forensics, LLC examines

Defendant Ward's handwritten notes.

### **2018**

### **THE CRIMINAL TRIAL**

351.    **January 2, 2018** – Plaintiff's forensic handwriting expert, Erich Speckin, issues a

report indicating that Ms. Ward's notes were not formulated contemporaneously with

the children's sessions.

---

[25] The prosecutors sought an order to allow a protective screen to be constructed in front of the witness stand which would prevent the minor children from being able to see the Plaintiff sitting at counsel table. They intended to use Defendant Ward as an expert to substantiate the special purpose for not allowing the children to be able to see their father sitting at counsel table. The motion was never heard and therefore never granted.

352.        Plaintiff's attorneys turn this over to the prosecutor.

353.        The prosecutors categorically ignored all the red-flags brought about by

Defendant Ward's criminal actions, and Plaintiff's requests to dismiss the case.

354.        **January 4, 2018** – Four days before the trial is set to begin, prosecutor Kyle

Butler emails Defendant Hesche; makes arrangements for HK to watch the recording of

his own forensic interview.

355.        **January 5, 2018** – Defendant Hesche unseals the forensic interview evidence

package; removes DVD; HK watches his own forensic interview.

356.        Defendant Hesche and prosecutor Butler's actions further served to taint the

mind of HK and ensured that HK would be able to rehearse his testimony in advance of

trial.

357.        **January 8, 2018** – Criminal trial begins; Defendants Kihn and Denny testify.

358.        **January 10, 2018** – Defendants Kihn, Hesche and Thomas testify.

359.        Defendant Kihn testifies that she never had a discussion with HK or RK about the

reason for them going to IMSAFE children's assessment center on October 21, 2016.

360.        She testified that she merely told the children that people were going to be

talking to them.

361.        She testified that she did not tell the children about what the forensic interviewer

would be talking to the children about.

362.        She testified that she had not even talked to her children about that text message

that she received from Defendant Ward.

363.        Defendant Kihn further stated she had *never* talked to her kids about what

allegedly happened.

364.    Defendant Kihn also brainwashed RK into believing that Plaintiff was a bad person

and was trying to take her and HK away from Defendant Kihn.

365.    **January 11, 2018** – Defendant Thomas and RK testify.

366.    Defendant Thomas testifies she followed forensic interview protocol.

367.    RK testifies**,** under inquiry from the prosecuting attorney, that her mother told her

to come to court to say Plaintiff touched her bad spot with his bad spot. (Crim Tr Transcr,

Day 3, 255: 9-11).

368.    RK testifies that her mother coached her to say Plaintiff touched her genitals.

(Crim Tr Transcr, Day 3, 253: 9-15).

369.    RK testifies that her mother, Defendant Kihn, told her to say "Brad" (Plaintiff)

used his bad spot to touch her bad spot. (Crim Tr Transcr, Day 3, 255: 9-10).

***370.    The following is direct trial testimony from RK:***

***371.    Q:    "Did your mom tell you that Brad is trying to take you away?"***

***372.    A:    "Yes."***

***373.    Q:    "Did your mom tell you that Brad is a bad person?"***

***374.    A:    "Yeah." [26]***

375.    Defendant Kihn continued to brainwash RK, all the way up to the point when RK

took the witness stand.

376.    **January 12, 2018** – HK testifies.

377.    HK testifies that Defendant Kihn would speak to him when she received text

---

[26] Crim Tr Transcr, Day 3, 275: 15-18.

messages about his therapy from Defendant Ward.

378.    HK testifies Plaintiff made him watch "the porn." (Crim Tr Transcr, Day 4, 25: 9).

379.    **January 22, 2018** – Defendants Ward and Kimmel testify.

380.    Defendant Ward testifies she authored her notes contemporaneously with the children's therapy sessions.

381.    Defendant Kimmel testifies she communicated directly with Defendants Kihn and Ward during the month of October 2016, wherein they discussed the Plaintiff's efforts to reinstate his parenting time.[27]

382.    **January 24, 2018** – Plaintiff and forensic handwriting expert Erich Speckin testify.

383.    Plaintiff adamantly denies sexually assaulting his children.

384.    Speckin, a renowned handwriting expert, testifies Defendant Ward's notes were *not* made contemporaneously with the children's therapy sessions, and likely were written all at once.

385.    **January 25, 2018** – Plaintiff is found not guilty on all charges.

### COUNT II - CONSPIRACY TO DENY DUE PROCESS AND/OR EQUAL PROTECTION
### (42 U.S.C. §1985 – FOURTEENTH AMENDMENT)
### AS TO ALL DEFENDANTS

### PARENTAL TERMINATION TRIAL

386.    Paragraphs 1 to 385 are incorporated herein by reference.

387.    Due to double jeopardy, these Defendants and their prosecutors could not take further criminal action against Plaintiff, so they turned to the civil arena to get their revenge against Plaintiff.

---

[27] Crim Tr Transcr 125: 16-20.

388.     Plaintiff's constitutional rights were further violated when the Defendants and prosecutor conspired to take his children away.

389.     After Plaintiff's acquittal, the conspiracy to deprive Plaintiff's constitutional rights continued through the parental termination trial.

390.     Defendants continued to use their authority and influence with the prosecutor's office to advance their interests in violating Plaintiff's constitutional rights.

391.     The prosecutors are uncharged co-conspirators in this case.

392.     The prosecutors shared a mutual hatred for Plaintiff.

393.     They were an indispensable part of this conspiracy.

394.     But for the prosecutors' collective vitriol toward Plaintiff, this unspeakable tragedy could not have occurred.

395.     The prosecutors became willing participants in the conspiracy to deprive Plaintiff of his constitutional rights as a parent in order to advance Defendant Kihn's interests in erasing Plaintiff from the family picture.

396.     When they lost the criminal case, the collective vitriol of the Defendants and prosecutors spilled over to the parental termination proceedings.

397.     At the termination trial, Defendant Thomas again testified about the sexual abuse reported by HK and RK.

398.     Defendant Thomas maintained there was nothing wrong with her forensic interview.

399.     Defendant Denny testified he would believe Defendant Kihn at all costs. (Civ Tr Transcr, Vol. II of V, 172:5-6).

400.    Defendant Kimmel testified she had concerns about Plaintiff's suitability as a parent.

401.    Defendant Kihn again denied coaching HK and RK.

402.    HK again testified that he and RK were abused.

403.    Plaintiff sought to call RK as a witness, who was under a subpoena by the prosecutor.

404.    RK, who was accompanied by Defendant Kihn in a waiting room outside the courtroom, allegedly refused to testify.[28]

405.    When RK became unavailable, Plaintiff had RK's former testimony read into the record under MRE 804(b)(1).

406.    After the court made its ruling, prosecutor Butler became irate.

407.    Prosecutor Butler continued to advance Defendants' collective interests in punishing Plaintiff.

408.    The prosecutor's job is not to convict, but rather to do justice.

409.    For while he is permitted to strike hard blows, the prosecutor is not permitted to strike foul ones.

410.    The prosecutor is as much a protector of the accused's constitutional rights as he is a protector of a peaceful society.

411.    Unfortunately, he lost sight of this fact.

---

[28] This was a dubious claim made by the prosecutor, Kyle Butler. It is likely Defendant Kihn told RK she did not have to testify and communicated to Butler—off the record—that she was refusing.

412.     These prosecutors became blinded by their own biases and eagerness to please

the Defendants.

413.     The prosecutors, because they enjoy absolute governmental immunity, were the

perfect accomplices because they could advance the objects of this conspiracy without

fear of repercussions.

414.     The prosecutors, like these Defendants, developed a deep hatred for Plaintiff.

415.     Guided by their mutual hatred for Plaintiff, the prosecutors and Defendants

colluded to deny Plaintiff his fundamental right to parenthood.

416.     The prosecutors were the last people to join the conspiracy, but no less co-

conspirators.

417.     In short, the Defendants used the same flimsy, tainted, and unreliable evidence

from the criminal case to terminate Plaintiff's parental rights.

## **CONCLUSION**

418.     For over two long and painful years, Defendants caused Plaintiff to undergo

incalculable pain and suffering by using their governmental powers and connections to

deprive Plaintiff of his life and liberty.

419.     Plaintiff's life was his children.

420.     Plaintiff's liberty was deprived for 82 long and arduous days.

421.     Plaintiff continues to suffer greatly as a result of these Defendants' unspeakable

acts.

422.     Plaintiff wakes up each day to the realization that he cannot be a father to his

children.

423.     Plaintiff suffers from a constant void in his personal life, knowing that he cannot

be a father to HK and RK anymore.

424.     Plaintiff has not spoken to his children since April 2015.

425.     Plaintiff still suffers from recurring nightmares because of the Defendants' actions.

426.     Plaintiff constantly worries about arrested out of the blue, for no good reason.

427.     Plaintiff sometimes dreams that he can see his children from a few feet away, but

he is unable to speak to them or hug them.

428.     Plaintiff's emotional damages caused by the Defendants' collective actions are

incalculable.

429.     The financial damages are significant, with Plaintiff being forced to spend

extraordinary sums of money to pay for his defense and fight to keep his children.

430.     Cronyism formed the backbone of these malicious and repetitive violations of

Plaintiff's constitutional rights.

431.     Defendants had a legal, professional, and moral responsibility to ensure that

Plaintiff received due process and equal protection of the laws.

432.     Instead, the Defendants collectively sought to impose a great injustice upon

Plaintiff.

433.     Defendants refused to entertain the possibility that Plaintiff was innocent.

434.     Defendants brainwashed the children, who likely will suffer due to the

Defendants' actions.

435.     Defendants went out of their way to see to it that Plaintiff would not receive a fair

trial.

436.    And Defendants went out of their way to take away the only thing Plaintiff had left in his life besides his freedom.

437.    The decisions made by these defendants irreparably damaged Plaintiff's relationship with his minor children, culminating in the termination of his parental rights.

438.    The stress caused by Defendants' conspiracies is immeasurable and can never be repaired.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that judgment enter for Plaintiff and,

1.  Against all Defendants in an amount not less than $500,000.00;

2.  Against all individual Defendants for exemplary damages in an amount as determined by a jury;

3.  Against all Defendants for attorney fees as allowed by 42 U.S.C §1988;

4.  Against all Defendants for interest on the award to the date of filing of this complaint;

5.  Granting such other relief as allowed by law.


VERIFICATION AND SIGNATURE BY PARTY:

DATE:  November 18, 2019                    /S/Bradley Edward Kihn
                                            BRADLEY EDWARD KIHN
                                            PLAINTIFF


SIGNATURE BY ATTORNEY:

DATE: November 18, 2019                     /S/ PATRICK WILLIAM O'KEEFE
                                            PATRICK WILLIAM O'KEEFE (P59324)
                                            ATTORNEY FOR PLAINTIFF